UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

TRAWANDA CAMBER,
On behalf of S.C.

                       Plaintiff,

      v.                                  11-CV-599

MICHAEL J. ASTRUE,
Commissioner of Social Security
Administration

                     Defendant.


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THOMAS J. McAVOY
Senior United States District Judge

## DECISION and ORDER

       Plaintiff Trawanda Camber brought this action pursuant to section 205(g) of the

Social Security Act, 42 U.S.C. § 405(g), appealing a final decision of the Social Security

Administration denying her daughter's application for Social Security benefits. Presently

before the Court are Plaintiff's and Defendant's motions for judgment on the pleadings

pursuant to Fed. R. Civ. P. Rule 12(c).

**I.    FACTS**

       S.C. was two years eleven months old on the date of the application for benefits

on May 28, 2008.  Plaintiff contends that S.C. was born with a multicystic dysplastic

right kidney which does not function, is developmentally delayed including

speech/language delays, and also suffers from asthma, psoriasis and gastrointestinal

impairments.

a.    **Developmental Delays**

In May 2007, when S.C. was two years eleven months old, she had an evaluation to determine her present level of skills and ascertain whether special education services were warranted.  S.C. was unable to identify toys by function, and her visual-spatial perception and nonverbal reasoning skills were found to be within the below average range.  S.C.'s adaptive skills were in the borderline range for all three composite scores of conceptual, social, and practical.

The ABAS-II results demonstrated that S.C. was unable to speak in sentences of six or more words; tell parents, friends, or others about her favorite activity; state her age; name six or more colors; keep working on hard tasks without becoming discouraged or quitting; state when she is happy, sad, scared, or angry; apologize if she hurts another's feelings; play simple games with playmates without supervision; wait for her own turn in games or other fun activities; remain seated during religious service or a movie; refrain from touching items in the store; keep toys, games, and other belongings neat and clean; tell her parent or other adult when she needs to go to the bathroom; and refrain from putting toys in her mouth.

Results of the Vineland Social-Emotional Early Childhood Scales ("Vineland SEEC") revealed that S.C. was unable to label happiness, sadness, fear, and anger in herself and recognize happiness, sadness, fear, and anger in others.  S.C. was reportedly unable to share toys or possessions without being told to do so, take turns while playing games without being reminded, or ask permission to play with or use a toy or object being used by another.  S.C. was reportedly unable to control her anger or hurt feelings when denied her own way.

Speech and language pathologist, Melissa Cornell, administered the Preschool Language Scale-4th edition ("PLS-4"), which revealed that S.C.'s receptive skills were delayed by three months, but S.C.'s expressive skills were delayed by fifteen months. S.C. was unable to demonstrate understanding of size concepts and age appropriate quantities.  Ms. Cornell recommended that Plaintiff receive speech and language therapy two times a week in a group no larger than three teachers to one student ("3:1").

School psychologist Marissa D. Meyerhoefer, M.A./C.A.S., recommended preschool services based upon a greater than twelve month delay in the area of language and a score more than 1.5 standard deviations below the mean in the area of adaptive skills and social and emotional.  Ms. Meyerhoefer stated that S.C. should be identified as a preschooler with a disability and receive a Special Education Itinerant Teacher ("SEIT"), two hours weekly and receive speech/language therapy, twice weekly for thirty minutes.

In July 2007, S.C.'s 2007-08 Preschool Individualized Education Program ("IEP") was established.  S.C. was to receive special education services with an SEIT on a 5:1 basis twice weekly for an hour, and speech/language therapy twice weekly for thirty minutes.

In November 2007, S.C.'s 2007-08 IEP was updated.  It was recommended that S.C. receive 5:1 services with an SEIT twice weekly for one hour at home.  S.C.'s related services included speech/language therapy.

In April 2008, Jillian Todero, M.A., CCC-SLP/L opined that S.C. should be discharged from the speech/language services at the end of the school year, that such

services were not recommended for the following school year, but that her speech and language skills should continue to be monitored. She noted that S.C. was making progress, but thought it important to note that S.C. readily slaps and hits her siblings.  In May of 2008, S.C.'s IEP report stated that she does not always display age appropriate social skills.

On June 18, 2008, Casey Duco, M.D. from Lyndon Pediatric Associates ("LPA") completed a questionnaire at the request of the state office of disability determinations. Dr. Duco was unable to answer or adequately answer most questions.  In terms of the six functional domains, Dr. Duco wrote, "more specific testing would need to be done to complete/accurately answer these questions."  On July 3, 2008, Dr. R. Mahonty, also from LPA, evaluated S.C. and found no limitation in five of the six domains, but found a less than marked limitation in the Health and Physical Well-Being domain. Explanation for these findings came from S.C.'s IEP and other portions of S.C.'s record.

In March 2009, Paula Rowell, a special education teacher who observed S.C., documented that S.C. made progress in areas of concern, especially social/emotional skills.  She was described as cooperative in the classroom, and her cognitive scores were all within the normal range, and was demonstrating age-level skills in learning concepts.  S.C. continued to develop letter and number recognition, and the writing of her name was emerging slowly.  Ms. Rowell also documented that S.C's teachers reported that S.C. was doing well overall, especially with her social skills.  Ms. Rowell also documented that the SEIT services would be discontinued for the following school year.

In November 2009, S.C.'s kindergarten teacher, Ms. Hartt, noted that S.C. was

not making academic progress and that she had difficulty in all academic areas.  Ms. Hartt noted that S.C. could not identify or write numbers and had difficulty with fine motor skills such as cutting.  S.C. had interventions in place at the time that included AIS reading support five times per week, a peer buddy that helped her, preferential seating, and 1:1 support during down time.  The intervention plan moving forward included additional screening for occupational therapy concerns, modification of cutting activities, use of ambidextrous scissors, student mentor help with flash cards for letter and number recognition, and identification and number work.

On June 22, 2010, Ms. Hartt completed a teacher/school questionnaire regarding S.C.'s functional limitations.  Ms. Hartt stated that she saw S.C. six and a half hours per day, five times a week since September 2009.  Ms. Hartt noted that S.C. had serious and very serious problems in activities related to the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for herself.  Ms. Hartt also stated that S.C's instructional level in reading, math, and written language were all below level.  S.C. needed 1:1 assistance from a teacher to finish most tasks.  It had been necessary to implement behavior modification strategies for S.C. requiring constant verbal intervention.

S.C.'s mother testified that S.C. needs more 1:1 time when in a larger group of kids, has trouble in math, cannot read a simple book, and has difficulties keeping friends.  S.C.'s mother testified that S.C. likes to hit, and that S.C.'s speech therapist said that S.C. hits because she is frustrated by her speech impairment.

b.      Medical Impairments

S.C. was born with a multicystic dyplastic right kidney and a single compensatory

hypertrophied left kidney.  Activity and dietary restrictions were not imposed on S.C.

based strictly on kidney impairment.

In April 2008, treatment notes with LPA showed that S.C. complained of a rash

on legs and stomach that had been there for awhile and a swollen belly with abdominal

pain.  Abdominal distention was observed.  S.C. also had scattered skin excoriated

circular lesions. The abdominal distention was noted to likely be secondary to

constipation.

On May 19, 2008, S.C. returned to LPA because her lesions had spread to her

trunk, chest, abdomen, and back.  S.C. had two large patches on her left lower back

and legs with thicker scale and excoriated.  S.C. was diagnosed with psoriasis.  Plaintiff

stated that she had not used the 1% hydrocortisone cream on S.C.'s legs as

recommended.  Further treatment for the psoriasis included switching soaps and

laundry detergent, and using different types of moisturizers including the hydrocortisone

cream.  S.C. also had diffuse abdominal tenderness with guarding.  Constipation versus

illness/mobility issue was diagnosed.  S.C. was diagnosed with intermittent abdominal

distention, potentially due to lactose intolerance or celiac's disease.

On June 3, 2008, Manoochehr Karjoo, M.D., treated S.C. for abdominal pain and

abdominal distention associated with constipation and diarrhea.  The condition was

noted to have been going on for a long time.  While the cause of constipation was not

entirely clear, it repeatedly responded to a colon clean out and maintenance with

dietary changes and MiraLax.  Despite the use of MiraLax, Dr. Karjoo's physical

examination revealed that S.C.'s abdomen continued to be distended and tympanic.

Dr. Karjoo prescribed erythromycin.

On November 19, 2008, Dr. Fazeli saw S.C. again for her skin condition as it had

spread.  Again, the discussion of soaps and moisturizers was discussed, as well as

protective measures such a photo avoidance.

On June 2, 2010, S.C. was seen one more time for her psoriasis.  She was

diagnosed with mild atopic dermatitis and mild seborrheic dermatitis.  Flaring plaques

were not noted at that time.  Shampoo, soaps and moisturizers were again discussed

and recommended.

## II.        STANDARD OF REVIEW

The Court's review of the Commissioner's determination is limited to two

inquiries.  First, the Court must determine whether the Commissioner applied the

correct legal standard.  Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir.1999).  Second, the

Court reviews whether the Commissioner's findings are supported by substantial

evidence within the administrative record.  Id. at 773.  The Commissioner's finding will

be deemed conclusive if supported by substantial evidence.  42 U.S.C. § 405(g); Rivera

v. Sullivan, 923 F.2d 964, 967 (2d Cir.1991).  In the context of Social Security cases,

substantial evidence consists of "more than a mere scintilla" and is measured by "such

relevant evidence as a reasonable mind might accept as adequate to support a

conclusion."  Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed.

126 (1938).  Where the record supports disparate findings and provides adequate

support for both the plaintiff's and the Commissioner's positions, a reviewing court must

accept the Administrative Law Judge's factual determinations.  Quinones v. Chater, 117

F.3d 29, 36 (2d Cir.1997).

## III.        DISCUSSION

Plaintiff seeks judicial review of the final decision of the Social Security Administration denying the claim that she submitted on behalf of her daughter S.C. for Social Security benefits.  Plaintiff alleges that S.C. has been disabled since 2007 due to a kidney disorder, history of asthma, developmental delay, speech impairment, psoriasis/dermatitis, and gastrointestinal impairments.  On appeal, Plaintiff argues that the Administrative Law Judge ("ALJ") failed to develop the record, erred in finding that S.C.'s psoriasis/dermatitis, gastrointestinal impairment, and speech impairment were not severe, and failed to apply the appropriate legal standards in assessing the credibility of Plaintiff.

### a.        Child Social Security Analysis

A child may receive Social Security benefits if the child has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382(a)(1) and § 1382c(a)(3)(C)(i) (effective March 2004).  To determine eligibility for benefits for a child, the ALJ applies a three-step analysis.  Pollard v. Halter, 377 F.3d 183, 189 (2d Cir.2004); 20 C.F.R. § 416.924(a).  At the first step, the ALJ determines whether the child is engaged in substantial gainful activity.  20 C.F.R. § 416.924(b).  This step is not at issue here because S.C. has not and is not engaging in substantial gainful activity as defined by the regulations.

At step two, the ALJ decides whether the child has a medically determinable severe impairment or a combination of impairments that is severe.  Id. at § 416.924(c). For a child, a medically determinable impairment or combination of impairments is not severe if it is a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations.  20 C.F.R. § 416.924(c).  If the claimant does not have a medically determinable severe impairment, the claimant is not disabled.   If the child has a severe impairment, the ALJ proceeds to step three.

At step three, the ALJ evaluates whether the impairment meets or medically equals or functionally equals a disability in the regulatory listing of impairments ("Listings"). 20 C.F.R. § 416.924(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1.  In making this determination, the ALJ must consider the combined effect of all medically determinable impairments, even those that are not severe.  20 C.F.R. § 416.923, 20 C.F.R. § 416.924a(b)(4), and 20 C.F.R. § 416.926(a) and (c).  If the claimant has an impairment or combination of impairments that meets, medically equals or functionally equals the Listings, and the impairment has lasted or is expected to last for a continuous period of at least 12 months, the claimant is deemed disabled.

In determining whether an impairment or combination of impairments functionally equals the Listings, the impairment must be of listing-level severity.  20 C.F.R. § 416.926a(d).  Listing-level severity is established if the claimant has "marked" limitations in two of the six functional domains set forth in the regulations, or if the claimant has an "extreme" limitation in one domain.  Id.  A "marked" limitation is one in which the impairment interferes seriously with one's ability to independently initiate, sustain, or complete activities.  20 C.F.R. § 416.926a(e)(2)(i).  An impairment is

"severe" when it interferes very seriously with one's ability to independently initiate, sustain, or complete activities.  20 C.F.R. § 416.926a(e)(3)(i).

When assessing how a child functions in his or her activities, the ALJ will assess the claimant's functioning in six domains: acquiring information; attending and completing tasks; interacting and relating with others; moving about and manipulating objects; caring for herself; and health and physical well-being.  20 C.F.R. § 416.926a(b)(1)(i-vi).

In applying the three-step analysis to the case at hand, the ALJ determined that S.C. did not engage in substantial gainful activity and that she has the following severe impairments: kidney disorder, history of asthma, and developmental delays. However, the ALJ found that S.C. did not have an impairment or combination of impairments that meets, medically equals or functionally equals one of the listed impairments.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  As a result, the ALJ concluded that S.C. was not disabled.

i.   **Severity of Impairments**

Under step two of the analysis, the ALJ must determine if the child has a medically determinable impairment that is severe, or has a combination of impairments that is severe.  20 C.F.R. 416 § 924(a).  For a child, a medically determinable impairment is not severe if the impairment is a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations.  20 C.F.R. § 416.942(c).

In the decision, the ALJ did consider S.C's speech impairment severe.  The ALJ uses the term "developmental delays" to refer to S.C.'s speech and language

delays, as well as her behavioral and academic delays.  The ALJ found the developmental delays to be severe, thus including S.C.'s speech impairment.  The Listings also group cognitive and speech/language delays into one category and are listed as "cognitive/communicative function."  20 C.F.R. Pt. 404, Subpt. P, App. 1(112.00)(C)(1)(b).  Therefore, Plaintiff's contention that the ALJ improperly failed to find S.C.'s speech impairment severe, as separate from her developmental delays, is inconsistent with the ALJ's decision as well as the Listings.

       The ALJ properly found that S.C.'s gastrointestinal impairment was not severe.  If a condition improves or is repairable, this can "provide substantial evidence to support a finding that a [claimant] is not disabled."  Ruback v. Astrue, No. 6:11-CV-770, 2012 WL 2120473, at *3 (N.D.N.Y. June 11, 2012) (citing Pennay v. Astrue, No. 3:05-CV-673, 2008 WL 4069114, at *5 (N.D.N.Y. Aug. 27, 2008)).  Also, for an impairment to be considered severe, it must more than minimally limit the claimant's functional abilities, and it must be more than a slight abnormality.  20 C.F.R. § 416.924(c).  A diagnosis of chronic constipation or belly distention is not in the Listings. 20 C.F.R. Pt. 404, Subpt. P, App. 1(105.00).  Further, in examination notes from January 2010, Plaintiff stated that S.C. was doing very well after the colon clean out and maintenance of MiraLax, and S.C. was having no problems with constipation. Plaintiff had weaned S.C. off of Miralax, and she was doing better.  S.C. was eating and sleeping well, and was active and playful.  Dr. Kesselring assessed that the constipation was likely just a behavior in a growing child who had responded to medication and toileting in the past.  Plaintiff points to instances where S.C. had to lie down to ease her pain, or go to sleep.  However, Dr. Kesselring's report suggests that proper

-11-

maintenance with medication and behavioral training would eliminate such instances over time, as they had already.  Based on these factors, sufficient evidence supported the ALJ's decision that S.C.'s gastrointestinal impairment did not impose more than minimal limitations on her functioning and, thus, was not severe.

The ALJ failed to explain his reasoning that S.C.'s psoriasis/dermatitis was not severe.  The Second Circuit has stated that in the case of an inability "to fathom the ALJ's rationale in relation to evidence in the record . . . we would not hesitate to remand the case for further findings or a clearer explanation for the decision." Berry v. Schweiker, 675 F.2d 464, 469 (2d Cir. 1982).  When a claim is premised on one or more of the impairments in the Listings, the Commissioner should supply a sufficient rationale as to his decision to deny or support a finding of a listed impairment. Id.  The medical records show that S.C. had lesions all over her body.  Such an impairment is addressed in the Listings, therefore warranting an explanation of why the ALJ did not consider this impairment severe.  20 C.F.R. Pt. 404, Subpt. P, App. 1(108.05). Because the ALJ failed to sufficiently explain why he failed to consider S.C.'s skin condition at this initial step of the analysis, the Court remands the case for further explanation.

### c.    Development of the Record

Plaintiff contends that the ALJ's failure to obtain a consultive examination or a medical source statement from an examining or treating physician or psychologist resulted in the deprivation of a full and fair hearing.  Under the regulations, the Commissioner must develop the claimant's complete medical history for at least 12 months preceding the month in which the application was filed and make every

reasonable effort to help obtain medical reports from plaintiff's own medical sources when permission is granted to do so.  20 C.F.R. § 416.912(d).   The ALJ has an affirmative duty to fill all clear gaps in the record, including medical history.  Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999).  A claimant has the responsibility to provide medical evidence to show that he or she has a severe impairment that affects functioning during the time that one says he or she is disabled, and any other information that the Commissioner needs to decide the claim.  20 C.F.R. § 416.912(c). The ALJ considers all relevant evidence in the child claimant's case record.  20 C.F.R. § 416.924(a).   Further, the ALJ has the discretion to order a consultive examination to resolve an inconsistency in the evidence or when the evidence as a whole is insufficient to support a decision or determination on the plaintiff's claim.  20 C.F.R. § 416.919a(b)(4).  The regulations state that only when a medical source cannot or will not give the Commissioner sufficient medical evidence about the plaintiff's impairment to determine whether he or she is disabled, will a consultive examination be purchased. 20 C.F.R. § 404.1517.  If there is sufficient evidence to make a determination, the ALJ is not obligated to again contact a medical source.  Hart v. Comm'r of Soc.Sec., No. 5:07-CV-1270, 2010 WL 2817479, at *5 (N.D.N.Y. July 10, 2012).

Pertaining to S.C.'s medical impairments, the ALJ fully developed the record. He acquired medical records from S.C.'s prenatal status in 2004 through her current status in 2010.  Medical records were obtained from her treating and non-treating physicians and those records are present in the administrative record.  A fully inclusive medical history is present in the record.  Accordingly, the Commissioner properly developed the record pertaining to S.C.'s medical impairments.

-13-

In regards to S.C.'s developmental delays, the ALJ appropriately developed the record.  The ALJ acquired S.C.'s most recent cognitive evaluation, teacher questionnaires, her IEPs, her results from numerous cognitive and language/speech tests, and her mother's testimony.  While Plaintiff correctly notes that the Commissioner will try to resolve any material inconsistency in the record, it is within the Commissioner's discretion to order a consultive examination or a medical source statement.  20 C.F.R. 406.1517.  Also, where the evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.  Mortise v. Astrue, 713 F.Supp. 2d 111, 116 (N.D.N.Y. 2010).

Plaintiff points to an underdeveloped report by Casey Duco, M.D. on June 11, 2008, where it was noted that more specific testing would need to be done to accurately answer the questions on the disability determination form.  However, Plaintiff fails to present evidence beyond Dr. Duco's examination that the ALJ failed to develop the record.  After Dr. Duco's examination, the ALJ had before him Dr. Mahonty's July 2008 evaluation of S.C., Ms. Rowell's evaluation and Ms. Hartt's evaluation.  Although the ALJ has an obligation to fill all "clear gaps" in a medical record, Dr. Duco's report was not the only piece of evidence regarding S.C.'s disability status.  The ALJ had conclusive test results and examinations from speech/language pathologists, school therapists and observations from teachers after the state agency requested Dr. Druco's and Dr. Mahonty's examinations.  Therefore there was no clear gap that the ALJ needed to fill by use of a consultive examination or a medical source statement from an examining or treating physician or psychologist.  Based on these factors, the ALJ properly developed the record for both S.C.'s medical and cognitive/communicative

-14-

histories.

### d.   Weight of Credibility

Plaintiff contends that the ALJ failed to afford appropriate weight to her own testimony, as well as the opinions of Ms. Meyerhoefer and Ms. Cornell.  Generally, the more consistent an opinion is with the record as a whole, the more weight it will be afforded.  20 C.F.R. 416.927(c)(4).  If the ALJ rejects subjective testimony, the reasons for rejection must be "set forth with sufficient specificity" to enable a reviewing court to decide whether the determination is supported by sufficient evidence.  Ferraris v. Heckler, 728 F.2d 585, 587 (2d Cir. 1984).  The ALJ must refer to specific evidence from the record that substantially supports his determination.  Id.  An ALJ need not "specifically discuss the weight given to each piece of evidence considered if the rationale for [his] opinion can be gleaned from other portions of [his] decision . . . ." Manchester v. Astrue, No. 77:08-CV-078, 2009 WL 2568579, at *8 (N.D.N.Y. Aug. 19, 2009).

On the other hand, the Second Circuit has held that failure to make credibility findings regarding critical testimony "fatally undermines" the argument that there is substantial evidence to support the Commissioner's conclusion that a claimant is not disabled.  Williams on Behalf of Williams v. Bowen, 859 F.2d 255, 261 (2d Cir. 1988). The regulations also state that, generally, opinion of a specialist about medical issues in his or her area of speciality will be afforded more weight than the opinion of a source who is not specialist.  20 C.F.R. § 416.927(c)(5).  The Court must also defer to the ALJ's findings of credibility of Plaintiff.  Aponte v. Secretary, Dep't. Of Health and Human Servs., 728 F.2d 588, 591 (2d Cir. 1984).

-15-

The ALJ found that Plaintiff was partially credible as to S.C.'s behavioral and kidney problems, and generally credible as to S.C.'s academic difficulties, asthma, prosiasis, stomach and dietary issues.  The ALJ properly afforded the correct weight to Plaintiff.  The ALJ found her generally credible in most areas, but where there was subjective medical evidence to the contrary, he did not discredit or reject her opinion, he simply found it partially credible.

The ALJ also assigned little weight to Ms. Hartt's opinion, and found Ms. Meyerhoefer's and Ms. Cornell's opinions had "some weight" because more Ms. Rowell's evaluation suggested that S.C. had age appropriate language skills, and her social skills improved.  However, the ALJ failed to explain the weight given to Ms. Rowell's evaluation and testing.  While the ALJ is not required to assess the credibility of every piece of evidence, Ms. Rowell's evaluation was critical to his analysis and accounted for the weight that he gave to many of the opinions in the record.  It is unclear to the Court why the ALJ only gives "some weight" to the opinions of Ms. Cornell and Ms. Meyerhoefer, which are consistent with the opinion of Ms. Hartt and Plaintiff's testimony.  Both Ms. Hartt and Plaintiff spent significant time with S.C.  Ms. Hartt spent six and a half hours a day, five days a week with S.C.  Similarly, Plaintiff was with S.C. on a regular basis.  Therefore, they both had more of an opportunity to form a well-founded opinion as to S.C.'s functional activities.

On the other hand, Ms. Rowell's evaluation came from two hours a week of one-on-one time at home, the cognitive testing session and opinions from other teachers.  While there is some evidence in the record to show that S.C. did make progress, there is a discrepancy between Ms. Rowell's evaluation and much of the

-16-

other evidence in the record.  In light of that discrepancy, the ALJ failed to sufficiently explain why Ms. Rowell's evaluation weighed more heavily than Ms. Hartt's opinion, which is corroborated by Plaintiff's testimony.

Further, the ALJ gave the opinion of the state level examiner, Dr. Mahonty, regarding S.C.'s functional domains "little weight because new evidence suggests greater limitations."  However, the ALJ failed to explain exactly what evidence showed that greater limitations exist and where such evidence came from.  It is unclear to the Court why Dr. Mahonty's opinion is given little weight based on the fact that S.C. has more limitations than he found, but also gives little weight to the opinions that express these limitations such as the opinions of Ms. Hartt, Ms. Cornell, Ms. Meyerhoefer, and Plaintiff's testimony.  The ALJ explained that Ms. Hartt's opinion had little weight, and Plaintiff's testimony only had some weight, because both are inconsistent with Ms. Rowell's evaluation.  Therefore, it is contradictory that the ALJ discredited Dr. Mahonty's evaluation with opinions that he in turn, discredited by Ms. Rowell's evaluation.  Again, the Court is left wondering why the ALJ so highly regarded Ms. Rowell's evaluation in light of the evidence in the record that is contrary to the evaluation and her opinion.  Because the ALJ heavily relied on Ms. Rowell's evaluation and opinion, but failed to sufficiently explain why he afforded Ms. Rowell so much weight, the ALJ failed to apply the correct legal standards.  Thus, the matter should be remanded for further administrative proceedings.

### e.   Functional Domains

Because the ALJ's analysis of four of the functional domains in Step 3 are dependant upon or include Ms. Rowell's evaluation and opinion, as well as the

consideration of opinions of Ms. Cornell, Mr. Meyehoefer, and Ms. Hartt, and Plaintiff's testimony, the analysis of those functional domains are skewed based on the ALJ's failure to apply the appropriate legal standards in assessing the credibility of the sources of evidence.

As to the remaining domains, the ALJ found that the S.C. had less than marked limitations in the Moving About and Manipulating Objects and Health and Physical Well-Being domains.  Plaintiff does not object to the ALJ's finding of less than marked limitations in Moving About and Manipulating Objects, but contends that there is sufficient evidence to find that S.C. has at least a marked limitation in the Health and Physical Well-Being domain.  The Court disagrees, and finds that there is sufficient evidence to support the ALJ's conclusion that S.C. had a less than marked limitation in this domain.

In the Health and Physical Well-Being domain, the ALJ considers "the cumulative physical effects of physical or mental impairments and their associated treatments or therapies" on functioning.  20 C.F.R. § 416.926a(l).  Some examples of limitations that the regulations indicate are as follows: generalized symptoms, such as weakness, dizziness, agitation, lethargy, or psychomotor retardation; somatic complaints; limitations in physical function due to medication; exacerbations from one impairment or a combination of impairments that interfere with physical function; or medical fragility and need for intensive care to maintain the level of health and functioning.  20 C.F.R. §§ 416.926a(l)(4)(i)-(v).  This domain considers how a physical or mental disorder effects the child when it comes to performing activities independently or effectively.  20 C.R.R. §§ 416.926a(l)(1)-(4).

The ALJ notes S.C.'s kidney impairment, as well as her asthma, chronic constipation, urinary control issues, and psoriasis.  The record reflects that S.C.'s kidney impairment does not inflict any restrictions on her daily life.  Dr. Schurman's opinion, which is consistent with the record, shows that S.C.'s compensatory hypertrophied kidney is normal, and S.C. is under no dietary or activity restriction. Nothing in the record indicates that S.C. has an increased risk of renal failure or any other limitations regarding her kidney impairment.  The record also does not indicate any evidence resembling marked limitations stemming from S.C.'s asthma.  While S.C. has asthma medication, Plaintiff does not contend that her asthma medication has any side effects.

Plaintiff also contends that due to gastrointestinal impairments and psoriasis, S.C. has at least marked limitations on her functioning in this domain.  Plaintiff points to the fact that S.C. must miss school and lie down while at school because of stomach pain from constipation, and she must practice photo avoidance and use of medication as a result of her psoriasis.  However, there is sufficient evidence to support the ALJ's finding that S.C.'s gastrointestinal impairments and psoriasis are not functionally limiting in this domain.  The gastrointestinal impairments were resolved with colon clean outs and maintenance with MiraLax, none of which created any side effects.  Dr. Kesselring's examination notes show that Plaintiff told him that S.C. was doing very well after the colon clean out and with maintenance of MiraLax, and S.C. was not having problems with constipation. Dr. Kesselring also inferred that the constipation would likely be relieved with appropriate behavior training.  The record also shows that the skin lesions, while extensive at some point, were not limiting and responded to the

-19-

continued and consistent use of medication which had no side effects. Plaintiff also fails to explain how the suggested measure of photo avoidance limits S.C.'s daily activities. S.C.'s IEP also indicates that she does not have any medical impairment that interferes with her academic functioning. In light of this evidence, the ALJ's conclusion that S.C. has a less than marked limitation in this domain is supported by sufficient evidence.

## IV.      CONCLUSION

For the foregoing reasons, the Court REMANDS this case for further administrative proceedings as to the following: why S.C.'s psoriasis is not a severe limitation; why Ms. Rowell's opinion holds such great weight; and a reconsideration of the four functional domains that include Ms. Rowell's evaluation and opinion, as well as those opinions that were discredited based upon her findings. Accordingly, the Court DENIES both the Plaintiff's and the Commissioner's motions for judgements on the pleadings.

IT IS SO ORDED.

Dated:November 16, 2012

Thomas J. McAvoy
Senior, U.S. District Judge